IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JERRY FENZEL                   :

                               :

    v.                         :   Civil Action No. DKC 13-0379

                               :

GROUP 2 SOFTWARE, LLC, at al.  :

                               :

**MEMORANDUM OPINION**

Presently pending and ready for review in this breach of contract action are motions for summary judgment filed by: (1) Defendant Group 2 Software, LLC ("Group 2") (ECF No. 87); (2) Defendant Deven Software, LLC ("Deven") (ECF No. 88); and (3) Defendant Thomas C. Bowen (ECF No. 89). Also pending are cross-motions for partial summary judgment filed by Plaintiff Harry J. ("Jerry") Fenzel ("Plaintiff"). (ECF Nos. 92; 93). The relevant issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment filed by Group 2 will be granted in part and denied in part. The motions for summary judgment filed by Deven and Mr. Bowen will be granted, and the cross-motions for partial summary judgment filed by Plaintiff will be denied.

I.   **Background**

A.   **Factual Background**

This case involves several contract, fraud, and equitable claims. Plaintiff provided consulting services to Group 2, a company that develops, promotes, and sells software packages for use in merger and acquisition transactions (the "EMA software"). According to Plaintiff, he learned about an opening for a CEO position at Group 2 in November 2010. Plaintiff met with Mr. Bowen, the owner or managing member of Group 2, on November 12, 2010. (ECF No. 92, at 1). Plaintiff alleges that, between January and April 2011, without a formal contractual or employment relationship, he assisted Mr. Bowen in building a website for Group 2, securing office space, and discussing business strategies. Plaintiff did not request or receive any compensation for this work. (*Id.* at 2). In early 2011, Plaintiff negotiated the terms for his consulting contract with Group 2 and Group 2's lawyers. (*Id.; see* ECF No. 92-4). Plaintiff alleges that on May 19, "[Mr.] Bowen, on behalf of Group 2, and Plaintiff executed Plaintiff's employment contract dated May 1, 2011 [(the 'May 1 Agreement')]." (ECF No. 92, at 2). The May 1 Agreement provides that, "[c]ommencing May 1, 2011[, Plaintiff] will become a consultant to Group 2, assuming the role of CEO, and will devote such time as shall be necessary to further the business of Group 2." (*Id.* ¶ 1).

Under the May 1 Agreement:

> Commencing on May 1, 2011, and for 52 consecutive weeks thereafter, [Plaintiff's] compensation will be $2,000 per week. Unless agreed to otherwise by the Parties, [Plaintiff] will be paid $1,000 per week with the difference of $1,000 to be deferred and recognized as an obligation of Group 2 until paid by Group 2.   The deferred compensation shall be paid to [Plaintiff] upon the earliest of the following to occur: (i) Group 2 raises $300,000 in outside investment and/or debt capital (excluding any investment by [Mr. Bowen]), or (ii) Group 2's cumulative gross revenues exceed $1,000,000, or (iii) a change in control occurs whereby another party (or parties) owns 50% or more of the equity in Group 2, or (iv) the Parties agree to pay [Plaintiff] the outstanding balance of the amount of the liability to [Plaintiff].

(*Id.* ¶ 2).  The next paragraph reads, in its entirety:

> Upon the one year anniversary of this Agreement if [Plaintiff] is still acting in a consulting capacity, or as an employee of Group 2, or earlier if either event occurs: (i) a change in control occurs whereby another party (or parties) owns 50% or more of the equity in Group 2, or (ii) the Parties agree to award [Plaintiff] a non-contingent membership interest in Group 2 which shall represent a 15% ownership interest in Group 2, subject to [Plaintiff] executing an operating agreement or joinder to an operating agreement with Group 2.

(*Id.* ¶ 3).

In addition, the parties agreed that "[u]pon the one year anniversary of this Agreement, provided that Group 2 is experiencing positive cash flow and growth, Group 2 and

3

[Plaintiff] will negotiate in good faith terms for" a future business relationship. (*Id.* ¶ 5). The May 1 Agreement also contains provisions concerning the nondisclosure of confidential information and noninterference with clients that ran for the life of the contract and for one or two years thereafter. (*Id.* ¶¶ 6-8).

On or about June 1, 2011, a lawyer for Group 2, Don Rogers, requested that Plaintiff execute another contract. According to Plaintiff, "[t]he purpose of the meeting . . . was to sign a copy of the [May 1 Agreement] for Mr. Rogers' files." (ECF No. 92, at 3). Plaintiff signed the new document, which was dated June 2, 2011. The language of the second contract (the "June 2 Agreement") is virtually identical to that of the May 1 Agreement. (*See* ECF No. 92-7).[1]

Plaintiff asserts that he worked as CEO for Group 2 for 56 weeks from May 1, 2011, through May 24, 2012. (ECF No. 92, at 2). During this time, according to Plaintiff, he hired a team of software developers, developed marketing strategy for the EMA software, networked and travelled to meet with potential

---

[1] The parties agree that, except for minor discrepancies, there is no meaningful difference between the substantive language of the two contracts. In fact, the June 2 Agreement contains typographical errors that appeared in the earlier version. The dates on the first page and signature page, however, are different. (*See* ECF Nos. 92-5, at 1, 3; 92-7, at 1, 3).

customers, and hired business students to assist him in fulfilling his responsibilities. (*Id.* at 2-3).  Plaintiff took a month-long vacation to Italy from July 25 to August 25, 2011. He wrote in an e-mail to Mr. Bowen on July 11, "I do not ask for any comp for the month of August, even though I'll be in regular contact."  (ECF No. 92-9).  According to Group 2, Plaintiff's Italy trip constituted roughly five missed weeks of work.  (ECF No. 87-1, at 13).

On April 24, 2012, Mr. Bowen sent Plaintiff a letter terminating the consulting contract:

> Pursuant to the terms of the consulting agreement dated June 2, 2011, Group 2 Software LLC, is hereby terminating the consulting agreement effective May 24, 2012 ("Termination Date").
> Thus, as of May 24, 2012, [Plaintiff's] position with Group 2 is terminated and absent a new agreement, [Plaintiff] may not act for Group 2.  The above being said, Group 2 would have an interest in negotiating a new consulting agreement with you, if that is of interest to you.

(ECF No. 92-8).  Plaintiff received $47,333.00 in compensation while working for Group 2 over the course of 56 weeks.  Because the consulting contract called for Plaintiff to be paid $1,000.00 per week, plus an equal amount in deferred compensation, Plaintiff asserts that he is owed the difference

of $8,667.00.[2]   Furthermore, Plaintiff alleges that Group 2 did not record the deferred compensation as a liability, and that Plaintiff is entitled to a 15% ownership interest in Group 2. After Group 2 terminated the consulting relationship, Plaintiff applied for and received unemployment benefits.  On September 6, 2012, the Maryland Department of Labor, Licensing and Regulation ("MDLLR") determined that Plaintiff was eligible for unemployment benefits.  (ECF No. 92-14).

## B.  Procedural History

Plaintiff filed his original complaint in the Circuit Court for Prince George's County asserting claims against Group 2 and Mr. Bowen.  On February 4, 2013, Defendants removed this case to the United States District Court for the District of Maryland on the basis of diversity jurisdiction.  (ECF No. 1).  Shortly thereafter, Group 2 filed a counterclaim (ECF No. 20), which Plaintiff answered (ECF No. 21).  On December 23, 2013, Group 2 moved for a preliminary injunction (ECF No. 33), and Mr. Bowen moved to dismiss Plaintiff's claims.  A hearing was held on

---

[2] Plaintiff provides some evidence of payment from Group 2 during the contractual relationship.  Checks indicate that he was paid for work completed in May and June 2011 on July 13, 2011.  (ECF No. 92-13, at 1).  Plaintiff was paid for his services rendered in July and September on October 3, 2011. (*Id.* at 4).  Group 2 paid Plaintiff for October 2011 and the first week of November on November 7, 2011.  (*Id.* at 5). Plaintiff attaches two additional checks from Group 2, but it is unclear to what weeks or months of work the payments correspond. (*See id.* at 6-7).

February 12, 2014, at which the motion for a preliminary injunction was denied and the motion to dismiss was deferred. (ECF No. 38).   Also on February 12, a scheduling order was entered.   (ECF No. 39).   Plaintiff then filed an amended complaint (ECF No. 41), and Defendants answered (ECF No. 42). Group 2 did not reassert the counterclaim.   Plaintiff's motion for leave to file a second amended complaint was granted on June 24, 2014.   (ECF No. 57).   The second amended complaint added Deven as a party.   In granting leave, however, the court noted that "the intracorporate conspiracy doctrine bars Plaintiff's claim [in Count IX] and his motion to amend to add this claim will be denied." (ECF No. 57, at 4).   Accordingly, Count IX was stricken.   Again, Defendants' answer did not reassert any counterclaim.   (ECF No. 64).[3]

---

[3]   The Federal Rules of Civil Procedure do not plainly resolve the question whether the failure to reassert a counterclaim in an answer to an amended complaint constitutes abandonment of a previously asserted counterclaim.   Although some courts have held that failure to reassert counterclaims in response to an amended complaint does not waive the counterclaims or otherwise affect their viability, others have reached the opposite conclusion. *Ground Zero Museum Workshop v. Wilson*, 813 F.Supp.2d 678, 705-06 (D.Md. 2011) (collecting cases).   The analysis in *Ground Zero* turned on whether, "despite [the defendant's] failure to reassert the counterclaims when answering [the plaintiffs'] first and second amended complaints, [he] has otherwise manifested his intent to pursue the counterclaims throughout the case history." *Id.* at 706.   Here, it is possible that Group 2 failed to prosecute and thereby abandoned its counterclaim. *See Davis v. White*, 794 F.3d 1008, 1016 (8th Cir. 2015) (finding no abuse of discretion when "the

The second amended complaint asserts the following claims: breach of contract against Group 2 requesting unpaid wages, deferred compensation, and a 15% ownership interest in Group 2 (Count I); breach of contract against Mr. Bowen requesting a 15% ownership interest in Group 2 (Count II); breach of the Maryland Wage Payment and Collection Act ("MWPCA"), Md. Code Ann., Lab. & Emp. § 3-505, against Group 2 and Mr. Bowen (Count III); accounting (Count IV); unjust enrichment (Count V); specific performance (Count VI); intentional interference with contractual relations against Mr. Bowen (Count VII); and fraudulent conveyance (Count VIII).[4]

Group 2 moved for summary judgment on counts I, III, IV, V, and VI, to which Plaintiff responded and filed a cross-motion for partial summary judgment, seeking, *inter alia*, a judgment for $64,667.00 in wages. (ECF Nos. 87; 92). The motions are fully briefed. (ECF Nos. 99; 103). Deven moved for summary

district court adopted an equitable approach in determining whether [the defendant's] counterclaim should be deemed abandoned, concluding that [the plaintiff] had lengthy notice [the defendant] was pursuing the counterclaim, undertook discovery on the counterclaim, and therefore would not be prejudiced"). Group 2 will be directed to inform the court whether it contends that the counterclaim remains viable.

[4] Count IX of the second amended complaint was stricken by the court's prior opinion, which determined that "the intracorporate conspiracy doctrine bars Plaintiff's claim [in Count IX]" and thus denied his motion to amend to add the claim. (ECF No. 57, at 4). Accordingly, there is no civil conspiracy claim pending against Defendants.

judgment on Count VIII (ECF No. 88), Plaintiff responded and withdrew Count VIII against Deven (ECF No. 94), and Deven replied (ECF No. 97).  Mr. Bowen also moved for summary judgment on Counts II, III, V, VI, and VII.  (ECF No. 89).  Plaintiff responded and filed a cross-motion for partial summary judgment (ECF No. 93), Mr. Bowen replied and responded (ECF No. 98), and Plaintiff replied (ECF No. 104).

## II.  Cross-Motions for Summary Judgment

### A.  Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party."  *Liberty Lobby*, 477 U.S. at 250; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

The moving party bears the burden of showing that there is no genuine dispute as to any material fact.  However, no genuine dispute of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.

9

*Celotex*, 477 U.S. at 322–23.   Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.   *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).   "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).   Although *pro se* litigants are to be given some latitude, the above standards apply to everyone.   Thus, as courts have recognized repeatedly, even a *pro se* party may not avoid summary judgment by relying on bald assertions and speculative arguments.   *See Smith v. Vilsack*, 832 F.Supp.2d 573, 580 (D.Md. 2011) (citing cases).

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011).   The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled

to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., Federal Practice & Procedure § 2720 (3d ed. 1998).

**B.   Analysis[5]**

**1.   Breach of Contract Claim Against Group 2 (Count I)**

Plaintiff seeks $64,667.00 from Group 2: $8,667.00 for unpaid wages and $56,000.00 in deferred compensation. Plaintiff also requests that the court award him a 15% ownership interest in Group 2, or fair market value of such an equity stake.

**a.   Plaintiff's Claim for Unpaid Wages**

Plaintiff seeks $8,667.00 in unpaid compensation based on work completed before Group 2 terminated the consulting

---

[5] All of Plaintiff's causes of action in the second amended complaint arise under Maryland state law. A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). For contract claims, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573 (1995). For tort claims, Maryland applies the principle of *lex loci delicti*, or the law of the "place of the alleged harm." *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726 (2010). "*Lex loci delicti* dictates that when an accident occurs in another state[, the] substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place." *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 745 (2000) (citation and internal quotation marks omitted). Here, because both parties rely exclusively on Maryland law as the substantive law governing Plaintiff's claims, Maryland law will be applied.

relationship.   (ECF No. 58 ¶ 14).   Under Maryland law, to establish breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant materially breached that obligation.   *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658 (2010). The thrust of Plaintiff's argument is that he worked for Group 2 through May 24, 2012 - when the contractual relationship was terminated - and is owed compensation for all of his consulting work, including that which occurred beyond the initial 52-week period for which a particular payment is specified.   In short, Plaintiff asserts that he worked for 56 weeks but was compensated for only 47 1/3 weeks, and that Group 2 breached by not paying him in full.   Group 2 challenges whether it was obligated to pay additional compensation.

Both the May 1 and June 2 Agreements provide that on, or as of, May 1, 2011, Plaintiff became "a consultant to Group 2, assuming the role of CEO." (ECF Nos. 92-5 ¶ 1; 92-7 ¶ 1).   Both also provide that as of or commencing on:

> May 1, 2011, and for 52 consecutive weeks thereafter, [Plaintiff's] compensation will be $2,000 per week.   Unless agreed to otherwise by the Parties, [Plaintiff] will be paid $1,000 per week with the difference of $1,000 to be deferred and recognized as an obligation of Group 2 until paid by Group 2.

(ECF Nos. 92-5 ¶ 2; 92-7 ¶ 2).  The consulting contract established Plaintiff's compensation for the first 52 weeks and provided that the parties would negotiate in good faith on the one year anniversary date regarding Plaintiff's business relationship with Group 2 and compensation.  (ECF Nos. 92-5 ¶ 5; 92-7 ¶ 5).  Furthermore, the arrangement had no specified end date, and either party was permitted to terminate upon 30 days' notice.  (ECF Nos. 92-5 ¶ 10; 92-7 ¶ 10).  In Maryland, under these circumstances, the relationship is "at will."  *See Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir. 1999) ("In Maryland, at-will employment is a contract of indefinite duration that can be terminated at the pleasure of either party at any time."); *Porterfield v. Mascari II, Inc.*, 374 Md. 402, 422 (2003) ("[A]n employment contract is of indefinite duration, unless otherwise specified.").  Even if the payment term of 52 weeks expired, the "continuance of employment can be evidence of an implied agreement to the terms of that employment." *Kropfelder v. Snap-On Tools Corp.*, 859 F.Supp. 952, 954 (D.Md. 1994) (quoting *Bodie v. City of Columbia*, 934 F.2d 561, 564 (4th Cir. 1991)).

Plaintiff and Group 2 appear to agree that Plaintiff was paid $47,333.00 between May 1, 2011, and May 24, 2012.  The parties dispute, however, whether this was adequate compensation for Plaintiff's work during that period.  As will be discussed

later, they disagree over the meaning of the contract terms. *See infra* Part II.B.1.c. Plaintiff and Group 2 contest when the contractual relationship began and whether Plaintiff can demonstrate entitlement to all of the unpaid wages he claims. Plaintiff presents some evidence that, if the relationship began on May 1, Group 2 did not compensate him in full for the period during which he performed consulting work and thus owes Plaintiff some money, either for work performed in August 2011 when he was in Italy, and/or for the weeks between May 1, 2012, and May 24, 2012. If the relationship began in June, as Group 2 contends, perhaps Plaintiff has been fully compensated. The parties dispute whether Plaintiff waived one month of compensation during his vacation in the July and August 2011. (ECF Nos. 87-1, at 13, 19; 92, at 6). Beyond challenging Plaintiff's entitlement to compensation during his vacation, however, Group 2 fails directly to address Plaintiff's claim.[6] As a result, there exists a dispute of fact regarding what amount of compensation – separate from Plaintiff's claims for

---

[6] Group 2 appears to argue generally that Plaintiff failed to perform his contractual duties and, accordingly, is not entitled to compensation. (ECF No. 87-1, at 19 ("[Plaintiff] did not work 52 consecutive weeks to qualify for deferred compensation.")). Group 2, however, advances this argument in response to Plaintiff's claim for deferred compensation and makes no such argument concerning Plaintiff's claim for unpaid wages. Moreover, the consulting contract provides only that Plaintiff will be paid for 52 consecutive weeks; no provision requires that Plaintiff work consecutively for 52 weeks.

deferred compensation and an ownership interest – remains unpaid, and whether Group 2 was under a contractual obligation to pay Plaintiff. Accordingly, the cross-motions for summary judgment on Plaintiff's claim for unpaid wages against Group 2 will be denied.

**b.   Plaintiff's Claim for Deferred Compensation**

According to Plaintiff, Group 2 breached the consulting contract by failing to pay him deferred compensation in the amount of $56,000.00. (ECF No. 58 ¶ 14). Under the consulting contract:

> The deferred compensation shall be paid to [Plaintiff] upon the earliest of the following to occur: (i) Group 2 raises $300,000 in outside investment and/or debt capital (excluding any investment by [Mr. Bowen]), or (ii) Group 2's cumulative gross revenues exceed $1,000,000, or (iii) a change in control occurs whereby another party (or parties) owns 50% or more of the equity in Group 2, or (iv) the Parties agree to pay [Plaintiff] the outstanding balance of the amount of the liability to [Plaintiff].

(ECF Nos. 92-5 ¶ 2; 92-7 ¶ 2). Group 2 argues that none of the conditions precedent has occurred, and it is under no duty to pay the deferred compensation. (ECF No. 87-1, at 19).

When a contractual duty is subject to a condition precedent, there is no duty of performance until the condition precedent has occurred or been performed. *Chirichella v. Erwin*, 270 Md. 178, 181 (1973) (citing *Griffith v. Scheungrab*, 219 Md.

27, 34–35 (1958)); *see* 13 Williston on Contracts § 38:1 (4th ed. 2012) ("A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance."). "Whether a provision in a contract is a condition the nonfulfillment of which excuses performance depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in [] light of all the surrounding circumstances when they executed the contract." 13 Williston on Contracts § 38:1; *see Chirichella*, 270 Md. at 182. Here, the consulting contract conditions payment of deferred compensation on: (1) Group 2 raising $300,000.00 in outside investment and/or debt capital (excluding any investment by Mr. Bowen); (2) Group 2 exceeding $1,000,000.00 in cumulative gross revenues; (3) a change in control occurs whereby another party (or parties) owns at least 50% of the equity in Group 2; or (4) an agreement to pay Plaintiff remaining deferred compensation. (ECF Nos. 92-5 ¶ 2; 92-7 ¶ 2).

To date, Plaintiff has not produced any evidence that one of the conditions precedent entitling him to deferred compensation has occurred. He argues that, "[d]ue to [Group 2's] refusal to provide an accounting, . . . [he] is not in a position to show that these triggering events have taken place." (ECF No. 92, at 9). According to Plaintiff, "a full accounting

16

of Group 2 will show that Group 2 has raised at least $300,000 in outside investment, or that Group 2's cumulative gross revenues have exceeded $1,000,000." (*Id.*).[7]   The discovery process has concluded, however, and Plaintiff cannot withstand summary judgment review without more than belief or mere conclusions.   There is no evidence of Group 2's financing or gross revenues.   Neither does Plaintiff provide evidence that Group 2's ownership has undergone a change.   Finally, there is no evidence that the parties have agreed to pay Plaintiff the outstanding balance of the deferred compensation, which remains a liability for Group 2.   Accordingly, Plaintiff's claim for deferred compensation fails as a matter of law, and Group 2 is entitled to summary judgment.

---

[7] Relatedly, Plaintiff argues that Group 2 "transferred its entire business – namely the EMA software – to" Deven. (ECF No. 92, at 9).   Conceding that "Deven does not hold itself out as a successor to Group 2," Plaintiff nevertheless contends that "Deven either owns a 50% or greater interest in Group 2, . . . or Deven's books will show cumulative gross revenues of over $1,000,000." (*Id.* at 12).   As a threshold matter, Plaintiff did not include a breach of contract claim against Deven in the second amended complaint on the basis of successor liability. *See Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F.Supp.2d 399, 435 (D.Md. 2006) ("A plaintiff may not amend its complaint through arguments at the summary judgment stage."). Moreover, Plaintiff lacks evidentiary support and cannot substantiate his claim.

c.   **Plaintiff's Claim for a 15% Ownership Interest**

The consulting contract provides:

> Upon the one year anniversary of this
> Agreement if [Plaintiff] is still acting in
> a consulting capacity, or as an employee of
> Group 2, or earlier if either event occurs:
> (i) a change in control occurs whereby
> another party (or parties) owns 50% or more
> of the equity in Group 2, or (ii) the
> Parties agree to award [Plaintiff] a non-
> contingent membership interest in Group 2
> which shall represent a 15% ownership
> interest in Group 2, subject to [Plaintiff]
> executing an operating agreement or joinder
> to an operating agreement with Group 2.

(ECF Nos. 92-5 ¶ 3; 92-7 ¶ 3).  Unfortunately, this provision is

unintelligible; something apparently was left out.

Plaintiff argues that, although the provision is unclear,

"[a]t the time that Plaintiff signed the [May 1 Agreement], it

was explained to him that this paragraph meant that if he still

worked for Group 2 one year after signing the [May 1 Agreement],

he would receive a 15% equity interest in Group 2."  (ECF No.

92, at 13; *see* ECF No. 92-6 ¶ 1).  Plaintiff points to e-mail

correspondence with Mr. Rogers in April 2011 as evidence that

Group 2 intended to convey a 15% ownership interest after one

year.  The e-mail from Mr. Rogers, however, reads: "If your only

change is that you wish to get paid if Group 2 is sold during

the first 12 months, then we'll revise the Agreement to provide

that you get your deferred comp and 15% interest."  (ECF No. 92-

4, at 1).  Based on the foregoing, Plaintiff concludes, "Despite

18

the unclear and ambiguous language in paragraph 3 of the [May 1 Agreement], both parties intended to convey a 15% interest in Group 2 to Plaintiff upon the one year [anniversary]." (ECF No. 92, at 13).

Group 2 first contends that "there is no affirmative duty of Group 2 to transfer a 15[%] ownership interest to Plaintiff upon the one year anniversary of the consulting agreement. It simply does not say that. . . . [T]he contract has an 'if/then statement' without the 'then.'" (ECF No. 87-1, at 21). Second, Group 2 disputes whether the May 1 Agreement controls, asserting instead that "'the one year anniversary of this Agreement' runs from the date of the [June 2 Agreement]." (*Id.*). In support of its contention, Group 2 argues that "the final executed version of the consulting agreement, which was dated June 2, 2011, was a novation of the [May 1 Agreement]." (*Id.* at 22). Group 2 draws a distinction between the effective date of the consulting relationship – May 1, 2011 – and what should be considered to be the one year anniversary of the contract. (*Id.* at 22-23). According to Group 2, it terminated the contractual relationship with Plaintiff on May 24, 2012 pursuant to the 30-day notice provision and prior to the one year anniversary of the June 2 Agreement. Moreover, and in the alternative, Group 2 argues in conclusory fashion that Plaintiff is not entitled to a 15%

ownership interest because he failed to meet certain benchmarks established by the consulting contract. (*Id.* at 23).

### i. Novation

A novation is a new contractual relation made with the intent to extinguish an existing contract. *I. W. Berman Props. v. Porter Bros., Inc.*, 276 Md. 1, 7 (1975). To constitute a novation, the party asserting it must demonstrate four elements: "(1) [a] previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract; and (4) the extinguishment of the old contract by the substitution of the new one." *Id.* Essentially, "there must be (evidence of) an agreement among the parties to extinguish the old obligation(s) and substitute a new one for it." *Id.* at 7-8 (citations omitted). "A novation is never presumed; the party asserting it must establish clearly and satisfactorily that there was an intention, concurred in by all the parties, that the existing obligation be discharged by the new obligation." *Id.* at 8 (citation omitted). When, as here, there is no express agreement to a novation, the requisite intent can be inferred from the facts and circumstances surrounding the transaction, as well as the subsequent conduct by the parties, "but such facts and circumstances, when shown, must be such to establish that the intention to work a novation is clearly implied." *Id.* (citations omitted). Confronted with conflicting evidence, "the

issue of whether or not there was a novation is one of fact for the jury, or the court sitting as a jury." *Id.* at 9 (citations omitted).

Here, the June 2 Agreement was signed by both parties, and Group 2 contends that the "[June 2 Agreement] *did and was intended* to replace the [May 1 Agreement] entirely." (ECF No. 87-2 ¶ 7 (emphasis added)). Plaintiff asserts, to the contrary, that he executed the June 2 Agreement upon being summoned to Mr. Rogers' office for the purpose of "sign[ing] a copy of the [May 1 Agreement] for Mr. Rogers' files." (ECF No. 92-6 ¶ 2). According to Plaintiff, "The [June 2 Agreement] was not meant to be a novation, and no discussion of a novation took place." (*Id.* ¶ 3). Plaintiff attested, "When I asked Mr. Rogers about the new date on the contract, he explained to me that his word processing settings required that everything printed was printed with the current date at the top of the first page." (*Id.* ¶ 4). There is no explicit language in the June 2 Agreement stating that it supersedes the May 1 Agreement. *See Aggarao v. Mitsui O.S.K. Lines, Ltd.*, 741 F.Supp.2d 733, 739 (D.Md. 2010), *aff'd in part, vacated in part, remanded sub nom. Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355 (4th Cir. 2012). The undisputed evidence is that the parties signed a new contract on June 2 containing minor edits, including a new date in the heading and on the

signature page.[8]   The parties dispute, however, whether there was intent to create a novation.   On the current record, a dispute of fact exists, and it is unclear whether Group 2 can produce evidence of intent sufficient to show that the June 2 Agreement constitutes a novation of the May 1 Agreement.

### ii.   Ambiguity and Incomplete Provision

Maryland courts apply an objective interpretation of contracts.   *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 448 (2008) (citation omitted).   "A fundamental principal of contract interpretation is to ascertain and effectuate the intention of the parties."   *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership*, 109 Md.App. 217, 290 (1996), *aff'd*, 346 Md. 122 (1997).   The language of the contract itself is the primary source for determining the parties' intentions.   *Shillman v. Hobstetter*, 249 Md. 678, 688-89 (1968).   Under Maryland law, "interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law."   *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163 (2003).   "A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning."   *Nova*

---

[8] Although the June 2 Agreement provides that the contract "commences on the date set forth below," the precise date is left blank.   (ECF No. 92-7 ¶ 10).

*Research, Inc.*, 405 Md. at 448.   In dealing with an ambiguity, courts may "consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract."   *Cty. Commissioners of Charles Cty. v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 445 (2001).   If, after examining extrinsic evidence, there remain genuine issues of material fact regarding the contract's interpretation, summary judgment should be denied, and resolution of these issues should be left to the trier of fact.   *Wash. Metro.*, 476 F.3d at 235 (citing *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)).

Here, there are two interpretation problems: (1) what is meant by "one year anniversary of this Agreement"; and (2) what paragraph 3 was meant to provide.   It appears that Plaintiff believes the anniversary is May 1, and Group 2 contends it is June 2.   Under both the May 1 and June 2 Agreements, the parties' contractual relationship apparently began May 1, 2011. (ECF Nos. 92-5 ¶ 1; 92-7 ¶ 1).   The parties signed the May 1 Agreement on or about May 19, 2011.   (ECF Nos. 58 ¶ 6; 92, at 2).   And on June 2, 2011, Plaintiff signed the June 2 Agreement. (ECF Nos. 58 ¶ 7; 92, at 3).   Paragraph 10 provides that the contract "commences on the date set forth below" (ECF Nos. 92-5 ¶ 10; 92-7 ¶ 10), but confusion persists because the signature date to which paragraph 10 refers differs in the two versions of

the contract.   The May 1 Agreement was "understood and agreed to
as of May 1, 2011."  (ECF No. 92-5, at 3).   The June 2 Agreement
provides that the contract was "understood and agreed to as of
June __, 2011," leaving the precise date blank.  (ECF No. 92-7,
at 3).   Neither version of the contract defines "one year
anniversary," and extrinsic evidence does not clarify the
ambiguous term.   The anniversary could refer plausibly to the
date on which Plaintiff began receiving compensation, the date
on which the May 1 Agreement was signed, or the date on which
the June 2 Agreement was signed.   The ambiguity materially
affects whether Plaintiff – should he be able to show that the
parties intended to transfer equity upon the one year
anniversary – is entitled to a 15% ownership interest in Group
2.

　　Furthermore, paragraph 3 – the contract provision at issue
– is not merely ambiguous; due to a missing term, it is
unintelligible.

> [W]hile there are few rules of
> interpretation more firmly established or
> universally accepted than that courts may
> not rewrite the contract of the parties,
> there are equally few courts that will give
> the words of a contract their literal
> meaning if it appears from the surrounding
> circumstances that a literal construction or
> interpretation will defeat or frustrate the
> intentions of the parties.

11 Williston on Contracts § 31:7 (4th ed. 2012). Here, the court cannot interpret paragraph 3 literally, as it is an indecipherable provision obviously missing a key clause. According to Plaintiff, "[b]y still working for Group 2 on the one year anniversary of the [May 1 Agreement], Plaintiff satisfied the one contractual requirement necessary for him to receive his 15% interest in Group 2." (ECF No. 92, at 14). Group 2 concedes that "[t]here appears to be something missing at the end of the paragraph, but it essentially lays out [three] conditions, including if Plaintiff is a consultant or employee upon the one year anniversary of the agreement." (ECF No. 87-1, at 21).  Group 2 argues that the contract provision "simply does not say that" Plaintiff is entitled to a 15% ownership interest upon the one year anniversary. (*Id.*).

Extrinsic evidence in the current record does not solve the problem.  Plaintiff asserts that, "[a]t the time that Plaintiff signed the [May 1 Agreement], it was explained to him that this paragraph meant that if he still worked for Group 2 one year after signing the [May 1 Agreement], he would receive a 15% equity interest in Group 2." (ECF No. 92, at 13; *see* ECF No. 92-6 ¶ 1).  Plaintiff's e-mail correspondence with Mr. Rogers from April 2011 does not conclusively demonstrate agreement on that point.  Rather, Mr. Rogers wrote: "If your only change is that you wish to get paid if Group 2 is sold during the first 12

months, then we'll revise the Agreement to provide that you get your deferred comp and 15% interest." (ECF No. 92-4, at 1). Plaintiff produces no other evidence that the parties intended to convey a 15% ownership interest in Group 2 upon the contract's one year anniversary. Furthermore, according to Mr. Bowen, "benchmarks detailed in the consulting agreement, namely $300,000 in outside investment or debt capital, $1,000,000 in cumulative gross revenues, and positive cash flow and growth, were conditions precedent to Plaintiff receiving the deferred compensation and the possible 15% membership interest in Group 2." (ECF No. 87-2 ¶ 21). Mr. Bowen continued, "[T]he consulting agreement actually provided [that] [the parties] had to reach an agreement on whether Plaintiff would receive a 15% ownership interest in Group 2." (*Id.* ¶ 22). The record certainly does not establish conclusively what the missing portion entailed. The cross-motions for summary judgment on Count I as to the 15% ownership interest will be denied.

### 2. Breach of Contract Claim Against Mr. Bowen (Count II)

Plaintiff asserts a claim for breach of contract against Mr. Bowen in Count II of the second amended complaint. Plaintiff alleges that, "at all relevant times, [Mr. Bowen] was the sole owner and sole member of [Group 2]. [Mr. Bowen] agreed to compensate Plaintiff for his work with [Group 2] with 15% ownership interest in [Group 2]." (ECF No. 58 ¶ 20). According

to Plaintiff, "after [Mr. Bowen's] refusal to grant Plaintiff his 15% ownership interest in [Group 2], [Mr. Bowen] transferred substantially all of the assets of [Group 2] to a successor company for no consideration in an attempt to prevent Plaintiff from receiving" the equity stake. (*Id.* ¶ 22). Plaintiff requests that the court award him a 15% ownership interest in Group 2, or fair market value of the same.

As noted above, to establish breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant materially breached that obligation. *RRC Northeast*, 413 Md. at 658. It follows, then, that generally "a person cannot be held liable under a contract to which he was not a party." *Mowbray v. Zumot*, 533 F.Supp.2d 554, 564 (D.Md. 2008) (quoting *Snider Bros., Inc. v. Heft*, 271 Md. 409, 414 (1974)); *accord Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md.App. 294, 316 (1999). Although Plaintiff contends that Mr. Bowen was a party to the contract and under a contractual obligation to transfer a 15% ownership interest, the plain language of the contract says otherwise. Plaintiff and Group 2 are the only parties to both the May 1 and June 2 Agreements. (*See* ECF Nos. 92-5, at 1; 92-7, at 1 (establishing the terms of a consulting agreement "between Jerry Fenzel ('Fenzel') and Group 2 Software, LLC ('Group 2,' and together

27

with Fenzel the 'Parties')")).  The only promises found in the contract are made by Group 2 to Plaintiff.  Other than Plaintiff, the only signatory is Mr. Bowen as "sole member" of Group 2.  Even though Mr. Bowen signed the contract on behalf of Group 2, he is not a party to it.  "It is now well-established that if an agent fully discloses the identity of his principal to a third party, then, absent agreement to the contrary, he is insulated from liability." *Mowbray*, 533 F.Supp.2d at 564 n.12 (citation and quotation marks omitted); *accord Curtis G. Testerman Co. v. Buck*, 340 Md. 569, 653 (1995).  Accordingly, only Group 2 could be liable to Plaintiff for a breach of the contract, and summary judgment will be entered against Plaintiff and in favor of Mr. Bowen on Count II.

### 3.  Violation of the MWPCL (Count III)

In Count III, Plaintiff argues that Group 2 and Mr. Bowen have failed to pay back wages in violation of the MWPCL.  (ECF No. 58 ¶¶ 24-28).  The parties do not dispute that Plaintiff was paid $47,333.00 for work during the period from May 1, 2011 to May 24, 2012.  According to Plaintiff, Group 2 and Mr. Bowen "deliberately failed to pay Plaintiff his wages, including his deferred compensation, without valid reason.  The amounts owed to Plaintiff from [Group 2] include $8,667 plus $56,000 in deferred wages." (*Id.* ¶ 27).  Plaintiff cannot, however, maintain a claim under the MWPCL for deferred compensation

28

because, as explained above, he has not demonstrated that any one of the conditions precedent entitling him to deferred compensation has occurred to date.  He may, as discussed above, be entitled to some compensation for work up to $8,677.00.

   a.   **MWPCL Claim Against Group 2**

The MWPCL requires that employers pay accrued wages to employees upon termination of employment.  Md. Code Ann., Lab. & Emp., § 3-505.  An employer is "any person who employs an individual in the State or a successor of the person."  *Id.* § 3-501(b).  A wage is "all compensation that is due to an employee for employment."  *Id.* § 3-501(c)(1).  If "a court finds that an employer withheld the wages of an employee in violation of [the MWPCL] and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs."  *Id.* § 3-507(b)(1).

> Notably, the [MWPCL] does not define "employee."  But, in [*Baltimore Harbor Charters, Ltd. v. Ayd*], the Maryland Court of Appeals made clear that the [MWPCL's] provisions extend to executive and professional employees.  365 Md. 366, 384-85 (2001).  The court stated: "Thus, if the General Assembly had intended to exclude administrative, executive and professional employees from the provisions of §§ 3-505 and 3-507.1, or otherwise limit the application of these provisions to that class of employees, it would have expressly done so."  *Id.* at 385.  The court reasoned that the use of the word "employee" in the statute was meant to distinguish between

29

> independent contractors and servants of the
> employer. *Id.* at 387.
>      An "employee" within the purview of the
> [MWPCL] is one who would be considered an
> agent or employee, as opposed to an
> independent contractor, at common law. *Id.*

*Horlick v. Capital Women's Care, LLC*, 896 F.Supp.2d 378, 388 (D.Md. 2011).

Several factors are relevant in considering whether an individual is an "employee" under the MWPCL, including: (1) whether the employer actually exercised or had the right to exercise control over the performance of the individual's work; (2) whether the individual's service is either outside all the usual course of business of the enterprise for which such service is performed; (3) whether the individual is customarily engaged in an independently established trade, occupation, profession, or business; (4) whether it is the employer or the employee who supplies the instrumentalities, tools, and location for the work to be performed; (5) whether the individual receives wages directly from the employer or from a third party for work performed on the employer's behalf; and (6) whether the individual held an ownership interest in the business such that the individual had the ability and discretion to affect the general policies and procedures of the business. *Id.* at 388 (citing *Ayd*, 365 Md. at 392; *Dunn v. Eastern Petroleum*, No. JKB–09–2851, 2011 WL 310400, at *5-6 (D.Md. Jan. 26, 2011)).

Under the MWPCL, wages are defined as "all compensation that is due to an employee for employment," including bonuses, commissions, fringe benefits, and "any other remuneration promised for service." Md. Code Ann., Lab. & Emp., § 3-501(c). Wages must be payment due for work the employee actually performed. *See Provident Bank of Maryland v. McCarthy*, 383 F.Supp.2d 858, 861 (D.Md. 2005). "Even if an employer is found liable for wages, the employer is not liable for statutory treble damages, attorneys' fees, or costs under the [MWPCL], if there [was] a bona fide dispute about the payment." *Horlick*, 896 F.Supp.2d at 389 (citing *Ayd*, 365 Md. at 396; Md. Code Ann., Lab. & Emp., § 3-507(b)(1)).[9] If unclear, the "existence of a bona fide dispute under § 3-507 is a question of fact left for resolution by the jury, not the trial judge." *Ayd*, 365 Md. at 396.

In its motion for summary judgment, Group 2 does not argue that Plaintiff's statutory relief is unavailable owing to a bona fide dispute regarding payment. The possibility is inescapable,

_____

[9] The existence of a bona fide dispute over wages affects whether treble damages, attorneys' fees, and costs may be awarded. This inquiry concerns whether there existed a "legitimate dispute over the validity of the claim or the amount that is owing. . . . The question, simply, is whether there was sufficient evidence adduced to permit a trier of fact to determine that [the defendant] did not act in good faith when it refused to pay" wages to the plaintiff at the end of the employment relationship. *Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 543 (2000).

however, that such a dispute over compensation owed to Plaintiff existed at the time Group 2 terminated the consulting relationship in May 2012. Group 2, because it did not advance this argument, is not entitled to summary judgment on Plaintiff's MWPCL claim. Instead, the parties wrestle throughout the briefing papers over Plaintiff's status, and a genuine dispute exists concerning the nature of Plaintiff's status – whether Plaintiff was an "employee" entitled to statutory protection or merely an independent contractor. (*See* ECF Nos. 87-1, at 25-29; 92, at 15-19; 99, at 13-21; 103, at 4-7). Group 2 argues that Plaintiff was an independent contractor, and Plaintiff concludes that the relevant factors demonstrate an employment relationship.

The multi-factor test outlined in *Ayd* calls for an analysis of various factual nuances to determine whether Plaintiff is properly classified as an employee of Group 2. For nearly all, there is a legitimate dispute of fact, precluding summary judgment. First, did Mr. Bowen, as the sole member of Group 2, have the right to direct and exercise control over the performance of Plaintiff's work? Critically, this factor concerns whether Mr. Bowen could have exercised control over Plaintiff, not whether he actually did. *Ayd*, 365 Md. at 393. Plaintiff concedes that Mr. Bowen "rarely, if ever[,] gave [Plaintiff] instructions as to what to do or how to run a

business as [Mr. Bowen] reminded [Plaintiff] that he had no experience in running a software company or any kind of company, except for hauling sailboats." (ECF No. 92-2, at 10). Similarly, Mr. Bowen attested, "Plaintiff was given significant autonomy in [his consulting position], and neither I nor Group 2 dictated how or where he was to provide the services contemplated in the consulting agreement." (ECF No 87-2 ¶ 10). On the other hand, Plaintiff explained that Mr. Bowen "had the authority to exercise control over [Plaintiff's] actions and decisions. [Mr. Bowen] hired [Plaintiff] and had the authority to fire [Plaintiff] at any time. [Mr. Bowen] also controlled the Group 2 checkbook . . . . [Mr. Bowen] could overrule any Group 2 decision [Plaintiff] made." (ECF No. 92-6 ¶ 13). If believed by a trier of fact, testimony adduced by Plaintiff supports the proposition that Mr. Bowen had the authority to direct and exercise control over Plaintiff. *Ayd*, 365 Md. at 393.

Second, did Plaintiff's work fall within the usual course of Group 2's business? As Plaintiff argues, he "was hardly a plumber called by [Group 2] to fix a leaky faucet. Plaintiff had high[-]level, continuous responsibilities that were integral to [Group 2's] business." (ECF No. 92, at 17). Group 2's contention that "Plaintiff did not provide software or coding services to Group 2" is misplaced (ECF No. 87-1, at 28); Group 2

33

concedes that Plaintiff was expected to "provide management services, pursuant to the consulting agreement, including product development, sales and obtaining investors." (ECF No. 87-2 ¶ 16; *see* ECF No. 99, at 16). Plaintiff acted in his capacity as CEO, and Plaintiff's MWPCL claim is not weakened because he did not actually build or maintain the software marketed by Group 2. The third factor concerns whether Plaintiff was customarily working in his own interest, albeit also benefitting Group 2. At bottom, this inquiry examines whether Plaintiff performed his work as an independent contractor. *Ayd*, 365 Md. at 393; *see Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006). Group 2 argues that, during the term of the consulting relationship, Plaintiff was also providing the same services to another company and serving as its president and CEO. (ECF No. 87-1, at 28; *see* ECF Nos. 87-9; 99-6; 99-7; 99-8). Plaintiff asserts in response, "During my time employed by Group 2, I did not work [for] nor received any compensation from any other entity . . . . Further, I did not market myself as an independent contractor or provide consulting services to any other companies." (ECF No. 92-6 ¶ 7). Thus, whether Plaintiff was customarily engaged in an independently established trade, occupation, profession, or business is disputed.

The fourth factor examines whether Plaintiff supplied his own equipment or used instrumentalities, tools, and locations provided by Group 2. According to Group 2, Plaintiff mostly worked from home and supplied his own computer and work materials. (ECF No. 87-1, at 28; *see* ECF No. 87-5, at 15). Mr. Bowen declared that "Group 2 had no rights or obligations to supply [Plaintiff] any tools, devices or other instrumentalities for his work as a consultant." (ECF No. 87-2 ¶ 13). Conversely, Plaintiff highlights that Group 2 provided office space for Plaintiff to use. (ECF No. 92, at 18; *see* ECF No. 87-1, at 28). The fifth factor queries whether Plaintiff received wages directly from Group 2 or from a third party for work performed on Group 2's behalf. Group 2 asserts that Plaintiff was paid as an independent contractor and received a Form 1099-MISC reflecting miscellaneous income rather than a Form W-2 for wages paid to employees. (ECF No. 87-1, at 29; *see* ECF No. 87-10). Group 2's argument proceeds thusly: "For tax purposes, Group 2 treated Plaintiff as, and Plaintiff reported to the Internal Revenue Service that he was, an independent contractor." (ECF No. 87-1, at 29). Plaintiff's classification for tax purposes, however, is not dispositive, at least in the analogous context of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* Indeed, a Form 1099 is generally used to report amounts paid to independent contractors, *see United*

*States v. Cox*, 856 F.2d 187, at *1 (4th Cir. 1988) (unpublished table opinion) (citing 26 U.S.C. § 6041(a)), but Group 2 focuses on formal labels rather than on the realities of the parties' working relationship — a position directly contrary to that adopted by the Supreme Court of the United States. *Calle v. Chul Sun Kang Or*, No. DKC-11-0716, 2012 WL 163235, at *5 (D.Md. Jan. 18, 2012) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947)). Plaintiff received compensation directly from Group 2, and there is no evidence that he was paid by a third party for work performed on behalf of Group 2. (*See* ECF No. 92-13). Finally, under the sixth factor, the parties agree that Plaintiff did not have any ownership interest in Group 2 during the first 52 weeks of employment. It is also undisputed that Group 2 did not transfer any equity to Plaintiff during the course of the consulting relationship. Accordingly, Plaintiff lacked "the ability and discretion to affect the general policies and procedures of the business." *Ayd*, 365 Md. at 395.

The competing declarations provided by the parties preclude a finding that either party has met its burden to demonstrate that there exists no genuine issue of material fact concerning whether Plaintiff is an employee under the MWPCL. *See Watson v. Brown*, 446 F.App'x 643, 645 (4th Cir. 2011) ("[The parties'] factual assertions effectively boiled down to a swearing contest backed chiefly by parties' own affidavits . . . . The district

court therefore erred when it made a dispositive credibility determination on the basis of the competing affidavits."). The cross-motions for summary judgment on Count III against Group 2 will be denied.

### b.  MWPCL Claim Against Mr. Bowen

Plaintiff also asserts that Mr. Bowen is personally liable under the MWPCA as an employer.  (ECF No. 93, at 6-9).  In support of his contention that Mr. Bowen is an "employer," Plaintiff relies on the multi-factor "economic reality" test developed to determine whether an employment relationship exists. *See Coles v. Von Paris Enterprises, Inc*, No. PJM-14-450, 2014 WL 6893861, at *3 (D.Md. Dec. 3, 2014).  Plaintiff's argument, however, is unavailing.

> The [MWPCL] requires employers to pay accrued wages to employees upon termination of employment.  Md. Code Ann., Lab. & Emp., § 3-505.  The MWPCL defines "employer" to include "any person who employs an individual in the State or a successor of the person." *Id.* § 3-501(b).  In *Watkins v. Brown*, the court noted that the definition is more "restrictive" than that found in the [Fair Labor Standards Act ("FLSA")].  173 F.Supp.2d 409, 416 (D.Md. 2001). Specifically, the MWPCL does not contain a provision that expands employer liability to those acting on behalf of the employer. *Id.* As such, an "employer" under the MWPCL has the "commonly understood meaning of the term . . . , which contemplates some sort of contractual relationship involving the payment of wages in exchange for services." *Id.* at 414.  Courts analyzing the MWPCL have rejected any interpretation that would

> encompass supervisors, officers, or other
> agents acting on behalf of the corporate
> employer. *See, e.g., id.* at 416; *Hosack v.*
> *Utopian Wireless Corp.*, No. DKC-11-0420,
> 2011 WL 1743297, at *5 (D.Md. May 6, 2011).

*Caseres v. S & R Mgmt. Co., LLC*, No. 12-CV-01358-AW, 2012 WL 5250561, at *4 (D.Md. Oct. 24, 2012).

Here, Plaintiff entered into a consulting agreement with Group 2. (*See* ECF Nos. 92-5; 92-7). He received payment via checks from a Group 2 bank account. (*See* ECF No. 92-13). The fact that Mr. Bowen had managerial authority "is insufficient, as a matter of law, to make him an 'employer' within the meaning of the MWPCL." *Watkins*, 173 F.Supp.2d at 416. Plaintiff submits no evidence that Mr. Bowen – separate from and in addition to Group 2 – was Plaintiff's employer under the consulting agreement. Accordingly, Mr. Bowen is "entitled to judgment as a matter of law on Plaintiff's MWPCL claims as it is undisputed that Plaintiff did not enter an employment contract with [Mr. Bowen] in his individual capacity." *Caseres*, 2012 WL 5250561, at *6. Summary judgment will be entered against Plaintiff and in favor of Mr. Bowen on Plaintiff's MWPCL claim in Count III.

### 4. Accounting (Count IV)

In Count IV, Plaintiff asserts that he is entitled to an accounting of Group 2's financial books and records. (ECF No. 58 ¶¶ 29-32). He alleges that, during the contractual

relationship, Group 2 "refused in bad faith to present to []
Plaintiff an accounting evidencing the existence of a liability
on its books and records, and federal and state tax returns,
representing the deferred compensation due [to] [] Plaintiff."
(*Id.* ¶ 30).   Moving for summary judgment on Count IV, Group 2
argues that "[t]he general rule is that a suit in equity for an
accounting may be maintained when the remedies at law are
inadequate." *Alternatives Unlimited, Inc. v. New Baltimore City
Bd. of Sch. Comm'rs*, 155 Md.App. 415, 508 (2004) (citation
omitted).

"To be sure, an accounting is considered an equitable
remedy." *Goldstein v. F.D.I.C.*, No. ELH-11-1604, 2012 WL
1819284, at *13 (D.Md. May 16, 2012) (citing *Mass Transit Admin.
v. Granite Const. Co.*, 57 Md.App. 766, 774 (1984)).   Moreover,
under Maryland law, "an accounting is available when 'one party
is under obligation to pay money to another based on facts and
records that are known and kept exclusively by the party to whom
the obligation is owed, or where there is a fiduciary
relationship between the parties . . . .'" *Polek v. J.P. Morgan
Chase Bank, N.A.*, 424 Md. 333, 365 (2012) (quoting *P.V. Props.,
Inc. v. Rock Creek Village Assocs. Ltd. P'ship*, 77 Md.App. 77,
89 (1988)).   "[W]hereas an equitable claim for an accounting
once served a necessary discovery function, that function has

been superseded by modern rules of discovery." *Alternatives Unlimited*, 155 Md.App. at 510.

> *P.V. Props.* provides an example under Maryland law of when a freestanding claim for accounting is appropriate. In that case, a commercial tenant in a shopping center sought "an itemized listing of common area maintenance expenses where the lease [was] silent in that respect and the landlord [was] unwilling to provide the desired information." 77 Md.App. at 80. The Maryland Court of Special Appeals explained the "general rule" that "a suit in equity for an accounting may be maintained when the remedies at law are inadequate," and said: "An accounting may be had . . . where there is a confidential or fiduciary relation between the parties, and a duty rests upon the defendant to render an account." *Id.* at 89 (citing, *inter alia*, *Nagel v. Todd*, 185 Md. 512 (1946)).

*Goldstein*, 2012 WL 1819284, at *14. In contrast, however, courts have rejected claims for accounting:

> where the plaintiff was fully capable of ascertaining, through its own efforts, the information it sought from the defendant by way of an accounting[;] where discovery was otherwise available[;] or where there was no basis for inferring that [the defendant] was in any sort of confidential relationship with or bore any fiduciary duty toward [the plaintiff].

*Id.* at *15 (citations and internal quotation marks omitted).

Here, Plaintiff requests information properly sought during the discovery process. According to Group 2, "Plaintiff has failed to and cannot reference any contractual, statutory or common law basis to obtain an accounting based upon the

40

circumstances of this case.  Plaintiff referenced the consulting agreement, but there is no fiduciary relationship created therein and no express obligation to provide an accounting to Plaintiff." (ECF No. 87-1, at 30).  Merely concluding that the financial accounts and records are maintained by Group 2, Plaintiff has not demonstrated any confidential or fiduciary relationship that would obligate Group 2 to render an account. (*See* ECF No. 92, at 19-20).  Nor has Plaintiff explained that "there are circumstances of great complication, or difficulties in the way of adequate remedy at law." *Alternatives Unlimited*, 155 Md.App. at 508-09.  As a result, construing Plaintiff's claim for accounting as an independent cause of action, summary judgment will be entered against Plaintiff and in favor of Group 2 on Count IV.

### 5.   Unjust Enrichment (Count V)

In Count V, Plaintiff asserts a claim for unjust enrichment against Group 2 and Mr. Bowen.  Plaintiff argues that Group 2 and Mr. Bowen received the benefit of Plaintiff's work from May 1, 2011, through the termination of the contractual relationship effective May 24, 2012.  In his prayer for relief under Count V, Plaintiff requests that the court award him the 15% ownership interest in Group 2 or, in the alterative, its fair market value.  (ECF No. 58 ¶¶ 33-40).  Defendants do not dispute that Plaintiff assisted Group 2 and was due compensation under the

terms of the consulting contract.    Plaintiff notes, however, that his unjust enrichment claim is "an alternative to his breach of contract claim, not in addition to it.   If the [c]ourt finds that no contract exists between Plaintiff and Defendant[s], Plaintiff's unjust enrichment claim is valid." (ECF No. 92, at 20).   As explained above, there exists a valid consulting contract, but Plaintiff has not yet demonstrated entitlement to a 15% ownership interest – the damage he seeks alternatively through Count V.

Under Maryland law, unjust enrichment requires: (1) a benefit conferred upon the defendant by the plaintiff; (2) the defendant's appreciation or knowledge of the benefit; and (3) the defendant's acceptance or retention of the benefit under circumstances that would make it inequitable for the defendant to retain the benefit without the payment of its value.   *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007). Critically, however:

> The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests . . . .   The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return.   Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated.   As a result, they have no remedy under the

> contract for restoring their expectations.
> In desperation, they turn to quasi-contract
> for recovery.  This the law will not allow.

*Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96 (2000) (quoting *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md.App. 766, 776 (1984)); *see also FLF, Inc. v. World Publications, Inc.*, 999 F.Supp. 640, 642 (D.Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

Here, a written contract governs the consulting relationship between Plaintiff and Group 2.  Contract remedies are available to Plaintiff, and the circumstances of the consulting relationship are not inequitable such that the court must award him a 15% ownership interest in Group 2.  Plaintiff will be expected to vindicate his claims through a cause of action for breach of contract.  Summary judgment will be entered against Plaintiff and in favor of Group 2 and Mr. Bowen on Count V.

### 6.  Specific Performance (Count VI)

Stemming from Defendants' alleged breach of contract, Plaintiff asserts Count VI seeking specific performance and a court order transferring a 15% ownership interest in Group 2 to Plaintiff.  (ECF No. 58 ¶¶ 41-47).  Plaintiff does not demand

specific performance concerning any other contractual provisions. The court, therefore, will treat Count VI as a prayer for a special remedy – specific performance – for Defendants' purported breach of contract pleaded in Counts I and II.

As a threshold matter, the availability of specific performance – a drastic equitable remedy – is contingent on Plaintiff demonstrating a contractual obligation and corresponding breach by Group 2. *See Geoghegan v. Grant*, No. DKC-10-1137, 2011 WL 673779, at *9 (D.Md. Feb. 17, 2011); *Data Consultants, Inc. v. Traywick*, 593 F.Supp. 447, 453 (D.Md. 1983) (citing *Offut v. Offut*, 106 Md. 236 (1907)), *aff'd*, 742 F.2d 1448 (4th Cir. 1984); *see also Namleb Corp. v. Garrett*, 149 Md.App. 163, 174 (2002) ("Specific performance may be granted in an appropriate case on the basis of the strength of the circumstances and equities of each party."). Should Plaintiff prevail on his breach of contract claims, the court will consider specific performance as a remedy. *See Zouck v. Zouck*, 204 Md. 285, 290 (1954) ("[A court] will not use its discretion to grant the remedy unless its exercise will subserve the ends of justice and the result of its assistance is fair, just and reasonable."). Plaintiff has not yet demonstrated a contractual entitlement to a 15% ownership interest in Group 2 – the ultimate compensation sought via specific performance – and the

cross-motions for summary judgment on Count VI against Group 2 will be denied.  Plaintiff cannot, however, maintain a breach of contract claim against Mr. Bowen.  Judgment will be entered in favor of Mr. Bowen on Count VI.

### 7.  Intentional Interference Claim (Count VII)

In Count VII, Plaintiff alleges that Mr. Bowen "intentionally and improperly interfered with Plaintiff's [contractual relationship with Group 2] with an improper motive to injure Plaintiff and to benefit his own personal interest." (ECF No. 58 ¶ 50).  Plaintiff offers no allegations of intentional and improper activity, let alone evidence of the same, and merely concludes that Group 2 "breached its [c]ontract with Plaintiff as a result of [Mr. Bowen's] intentional conduct, which . . . was outside the course of his position as officer and director and managing member of [Group 2]." (*Id.* ¶ 51).

"The tort of intentional interference with contract is well established in Maryland." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 296 (1994).  To state a claim, "a plaintiff must allege '(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff.'" *Ayres v. Ocwen Loan Servicing, LLC*, No. WDQ-13-1597, 2015 WL 5286677, at *10 (D.Md. Sept. 8, 2015)

(quoting *Fowler v. Printers II, Inc.*, 89 Md.App. 448, 466 (1991)).  "Intent can be proven 'by showing that the defendant intentionally induced the breach or termination of the contract in order to harm the plaintiff or to benefit the defendant at the expense of the plaintiff.'"  *Webb v. Green Tree Servicing, LLC*, No. ELH-11-2105, 2011 WL 6141464, at *5 (D.Md. Dec. 9, 2011) (quoting *Macklin*, 334 Md. at 301).  Furthermore:

> It is well established that in order to state a cause of action for tortious interference with a business relationship, a plaintiff must allege that a *third party*, without justification and for an unlawful purpose, intentionally interfered with the business relationship between the plaintiff and another, causing the plaintiff actual damage.  *See K & K Mgmt. v. Lee*, 316 Md. 137, 154-156 (1989); *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329 (1981); *Cont'l Cas. Co. v. Mirabile*, 52 Md.App. 387, 402, *cert. denied*, 294 Md. 651, 652 (1982).  Maryland courts have "never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract." *Wilmington Trust*, 289 Md. at 329; *K & K Mgmt.*, 316 Md. at 137.  Thus, when an employee acts within the scope of her employment, or as an agent of her employer, she cannot be held liable for interfering with the contract, business relationships, or economic relationships, between the employer and another.  *Cont'l Cas.*, 52 Md.App. at 402; *see also Borowski v. Vitro Corp.*, 634 F.Supp. 252, 258 (D.Md. 1986), *rev'd on other grounds*, 829 F.2d 1119 (4th Cir. 1987).

*Bleich v. Florence Crittenton Servs. of Baltimore, Inc.*, 98 Md.App. 123, 146-47 (1993).  Mr. Bowen argues that, as managing

member, he was Group 2's officer or agent. (ECF No. 89, at 15). Acting in that capacity, he cannot be held liable for interfering with the contract or business relationship between the Group 2 and Plaintiff. *Bleich*, 98 Md.App. at 147 (citations omitted).

Moreover, were Mr. Bowen subject to liability for intentional interference, Plaintiff's claim nevertheless fails. Mr. Bowen contends that, absent evidence that he acted for personal gain or without intent to further Group 2's interests, Plaintiff cannot maintain his interference claim. *See id.* at 147-48. To establish the tort of intentional interference, the underlying conduct must be wrongful or malicious, "quite apart from its effect on the plaintiff's business relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 657 (1994). The Court of Appeals of Maryland defines wrongful conduct as "common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Id.* (citation and internal quotations omitted). Thus, to state a claim, Plaintiff must forecast evidence that Mr. Bowen committed specific wrongful acts. Plaintiff, however, only offers conclusory allegations. There is no evidence that Mr. Bowen acted out of self-interest or fraudulently transferred

Group 2's proprietary software to Deven.   Although Plaintiff asserts that "[i]t would be impossible for Deven to offer [the EMA software] to customers unless [Mr. Bowen] moved the EMA asset from Group 2 to Deven" (ECF No. 93, at 10), Plaintiff's only offers Deven's website in support of his contention (*see* ECF No. 92-10).   At this point, Plaintiff's argument regarding Mr. Bowen's improper motives and a purported fraudulent conveyance is mere speculation.   Accordingly, summary judgment will be entered against Plaintiff and in favor of Mr. Bowen on Count VII.

### 8.   Fraudulent Conveyance (Count VIII)

In Count VIII, Plaintiff alleges that Mr. Bowen formed Deven "for the purpose of receiving assets from [Group 2]. . . . [Mr. Bowen] and Group 2 transferred and conveyed substantially all of the assets of Group 2, thereby rendering it insolvent and unable to satisfy a money judgment in favor of Plaintiff and making Plaintiff's ownership interest in Group 2 worthless."   (ECF No. 58 ¶ 55).   Plaintiff asserts that "[Mr. Bowen] and Group 2 transferred Group 2's assets to Deven with the intent to hinder, delay or defraud Plaintiff and remove said assets from Plaintiff's reach."   (*Id.* ¶ 57).   Maryland's Uniform Fraudulent Conveyance Act ("MUFCA"), Md. Ann. Code, Com. Law § 15-201, *et seq.*, provides a remedy if a creditor demonstrates that a conveyance was made without fair consideration and

48

either: (1) was committed by a person or entity who is or will be rendered insolvent by the conveyance (*id.* § 15-204); (2) was committed by a person or entity engaged or about to be engaged in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital (*id.* § 15-205); or (3) was committed by a person or entity who intends to or believes that he will incur debts beyond his ability to pay when he undertakes the conveyance (*id.* § 15-206). MUFCA also imposes liability for conveyances made with actual intent to hinder, delay, or defraud present or future creditors, irrespective of whether there was fair consideration for the transfer in § 15-207.

Deven moved for summary judgment on Count VIII (ECF No. 88), and Plaintiff withdrew Count VIII as to Deven "[i]n light of the absence of evidence provided in discovery." (ECF No. 94). It is not clear whether Plaintiff intended his claim for fraudulent conveyance in Count VIII to apply to Group 2 and Mr. Bowen as well.[10] The only remedies available under MUFCA are that the creditor may seek to set aside the conveyance or levy or garnish the property transferred by the conveyance. *See* Md. Ann. Code, Com. Law § 15-209; *Frain v. Perry*, 92 Md.App. 605,

---

[10] Group 2 and Mr. Bowen adopt and incorporate by reference Deven's motion for summary judgment on Count VIII. (ECF Nos. 87, at 1 n.2; 89, at 1 n.2; 97, at 4 n.2; 99, at 1 n.1).

619 n.7 ("Once a conveyance is held to be fraudulent, the creditor may either have the conveyance set aside, or may disregard the conveyance and attach or levy execution upon the property conveyed."), *cert. denied*, 328 Md. 237 (1992). Cases interpreting the statute have expanded the realm of available remedies to include suits for money judgments against the transferee when he or she "allows or causes the property to depreciate in value or parts with the property without sufficient consideration or puts it beyond the reach of the court." *Damazo v. Wahby*, 269 Md. 252, 257 (1973). No case, however, has authorized a money judgment against the transferor, or an agent of the transferor, for violations of MUFCA. *See Bassi & Bellotti S.P.A. v. Transcon. Granite, Inc.*, No. DKC-08-1309, 2011 WL 856366, at *9 (D.Md. Mar. 9, 2011). Here, Group 2 and Mr. Bowen are the purported transferors. Deven is the alleged transferee, and Plaintiff has withdrawn the fraudulent conveyance claims in Count VIII against Deven.

Furthermore, as discussed above, Plaintiff has failed to produce evidence of a fraudulent conveyance from Group 2 and Mr. Bowen to Deven. Plaintiff's claim for fraudulent conveyance against Group 2, Mr. Bowen, and Deven cannot withstand summary judgment review, and judgment will be entered against Plaintiff on Count VIII.

**III. Conclusion**

For the foregoing reasons, the motion for summary judgment filed by Group 2 will be granted in part and denied in part. The motions for summary judgment filed by Deven and Mr. Bowen will be granted.  The cross-motions for summary judgment filed by Plaintiff will be denied.  A separate order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge
